# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL JONES, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-3270 |
| | § | |
| AMERICAN COUNCIL ON EXERCISE, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for preliminary injunction filed by plaintiff Michael Jones.  Dkt. 22.  After considering the motion, response, reply, record evidence, and applicable law, the court is of the opinion that the motion should be DENIED but that this case should be set for trial on an expedited schedule.

## I. BACKGROUND

This is a trademark infringement and unfair competition case relating to the term "Medical Exercise Specialist."  Dkt. 5.  Plaintiff Michael Jones is the founder of American Academy of Health, Fitness & Rehabilitation Professionals.  Dkt. 22, Ex. 1.  Jones created a program to train and certify fitness professionals who work with post-rehabilitation patients, and he uses the term "Medical Exercise Specialist" in connection with the certification, course, and exam.  *Id.*  He has been using the term since 1994 and claims that he has spent significant time and money advertising this program.  *Id.*

Defendant American Council on Exercise ("ACE") is an organization in the health and fitness industry that "equips professionals with the tools they need to help all segments of society experience the innumerable benefits of leading an active lifestyle."  Dkt. 27.  It claims to have

"rigorous certification and continuing education standards for fitness professionals." *Id.*  According to ACE, it is a nonprofit organization that generated approximately $20 million in revenue in 2015. Dkt. 27 & Ex. 33 at 9.

In the late 1990s, Jones became an ACE Continuing Education Course provider, which helped him market the Medical Exercise Specialist course to ACE-certified personal trainers because the course was listed in ACE's catalogues and on its website.  Dkt. 22, Ex. 1.  However, in the early 2000s, Jones contends that ACE advised him that he could no longer be a continuing education provider because the Medical Exercise Specialist course was a competitor to ACE's Advanced Clinical Exercise Specialist program.  *Id.*

ACE eventually changed the name of its Advanced Clinical Exercise Specialist program to the Advanced Health and Fitness Specialist program.  Dkt. 22, Ex. 4.  In 2015, ACE again changed the program name, this time launching the "ACE Medical Exercise Specialist Certification." Dkt. 22, Ex. 5.  ACE documents specifically call this a "name-only change."  Dkt. 22, Ex. 5.

Jones asserts that ACE cannot use the name "Medical Exercise Specialist" because he (Jones) owns a common-law trademark to the term.  Dkt. 22.  He initiated this lawsuit to stop ACE from infringing on the mark.  *Id.*  Jones also seeks lost profits and other damages for ACE's alleged infringement.  *Id.*  ACE filed an answer in which it asserts various defenses including that its use of the term "Medical Exercise Specialist" is "fair use."  Dkt. 18.  In the motion at issue in this order, Jones seeks a preliminary injunction prohibiting ACE from using the term "Medical Exercise Specialist."  Dkt. 22.  Jones contends that he faces irreparable harm that will destroy his business model if ACE continues using the name.  *Id.*  ACE asserts that its use of the name is fair use, that

2

Jones has no rights to the name, and that an injunction would inflict hundreds of thousands of dollars of harm to ACE and run afoul of public policy.  Dkt. 34.

## II. LEGAL STANDARD

The decision to grant or deny a motion for preliminary injunction lies within the sound discretion of the district court.  *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).  "A court should issue a preliminary injunction if the movant shows '(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.'"  *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (quoting *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006) (internal quotations omitted)). "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have 'clearly carried the burden of persuasion on all four requirements.'" *Planned Parenthood of Hous. and Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quoting  *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003) (internal citations omitted)).

## III. HEARING

Under Federal Rule of Civil Procedure 65(a)(1), as interpreted by the Fifth Circuit, the parties must "have 'a fair opportunity and meaningful hearing to present their differing versions of . . . facts [that are in dispute] before a preliminary injunction may be granted.'"  *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (citing Fed. R. Civ. P. 65(a)(1) and quoting *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)).  "If the party requesting the injunction cannot show that

factual disputes exist regarding the required elements, and cannot introduce evidence sufficient to justify granting the motion, a hearing on the requested injunctive relief is unnecessary." *Id.* A district court thus may deny a motion for preliminary injunction without holding a hearing if it does not "rely on any disputed facts in determining whether the injunction should issue." *Id.* at 361 (noting that there was "extensive briefing" on the motion and that the district court also held a teleconference). Here, the court finds a hearing is unnecessary because even if it construes all disputed facts in Jones's favor, the court must deny his motion for a preliminary injunction.

## IV. ANALYSIS

The court will consider all of the preliminary injunction factors *in seriatim*.

### A.      Substantial Likelihood of Success on the Merits

Jones argues that he meets the heavy burden of showing there is a substantial likelihood of success on the merits because he owns a common-law trademark in the name "Medical Exercise Specialist" and ACE has infringed on that trademark by using the exact same name in the exact same industry. Dkt. 22. ACE argues that there is not a substantial likelihood of success because ACE will prevail on its affirmative defense that its use of the term "Medical Exercise Specialist" is fair use. Dkt. 34. Moreover, ACE asserts that even if the court looked beyond this defense, Jones has no valid rights to the term. *Id.* ACE contends that the mark is generic and unprotectable. *Id.* Jones counters that he has evidence proving distinctiveness. Dkt. 35. The court will first discuss the likelihood of success of the fair use defense, and then determine the likelihood of success of Jones's claim that ACE is infringing on its mark.

#### 1.      Fair Use Defense

To make out the statutory fair use defense, ACE must show that it made use of the term

4

"Medical Exercise Specialist" "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000); *see Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1185 (5th Cir. 1980) (noting that the "fair-use" defense described in 15 U.S.C. § 1115(b)(4) "is available only when the allegedly infringing term is used not as a trademark but 'fairly and in good faith only to describe to users the goods and services of [a] party, or their geographic origin.'" (quoting 15 U.S.C. § 1115(b)(4)). The defendant does not have an "independent burden to negate the likelihood of any confusion in raising the affirmative defense that a term is used descriptively, not as a mark, fairly, and in good faith." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 124, 125 S. Ct. 542 (2004). At the preliminary injunction stage, "the copyright owner must demonstrate (after establishing copyright ownership and the taking of *original* elements), where a *prima facie* fair use defense is presented, that the fair use factors are insufficient to support such a defense." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1275 n.31 (11th Cir. 2001).

The court denied ACE's motion for summary judgment on its fair use defense on October 18, 2016, finding questions of material fact. Dkt. 58. The court notes that a "preliminary injunction may issue . . . despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success." *Dall. Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979). However, "the district court must at least make clear that it has considered plausible defenses which *are* fully briefed and argued by [the] defendants." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 815 (5th Cir. 1989). "While a preliminary injunction may be appropriate even in the face of potentially significant defenses, it is frequently desirable in such cases to expedite the trial on the merits." *Id.* (citing 11 Charles Alan Wright &

5

Arthur R. Miller, *Federal Practice & Procedure* § 2950, at 484 (1973 & Supp. 1988)).  Here, while the defense is plausible, the court finds, for the same reasons it denied the motion for summary judgment on the defense, that the defense does not necessarily preclude the issuance of a preliminary injunction, particularly if the court expedites the trial schedule.

### 2.    Infringement

To prevail on a claim of trademark infringement under the Lanham Act, Jones must show: (1) he possesses a legally protectable mark; and (2) ACE's use of his trademark creates a likelihood of confusion as to source, affiliation, or sponsorship.  *Elvis Presley Enter., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998).  A mark is protectable if it is "distinctive, either inherently or by achieving secondary meaning in the mind of the public."  *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d at 329.  "Marks are often classified in categories of generally increasing distinctiveness; . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful."  *Two Pesos v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S. Ct. 2753 (1992).  "A mark need not be registered in order to obtain protection because '[o]wnership of trademarks is established by use, not by registration.'" *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008) (quoting *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 842 (5th Cir. 1990)).  "The protectability of unregistered marks is governed by the same principles that qualify a mark for registration under the Lanham Act.  *Id.*

### (a) Is the Mark Inherently Distinctive?

Because the mark is not registered, Jones has the burden of showing it is distinctive.  *See Am. Rice*, 518 F.3d at 329 (the plaintiff bears the burden of showing the mark is protectable).  Jones argues that the term "Medical Exercise Specialist" is inherently distinctive because it suggests, but

does not describe, his course and certification.  Dkt. 22.  Marks that are suggestive, arbitrary, or fanciful are considered "inherently distinctive" "because their intrinsic nature serves to identify a particular source of a product."  *Two Pesos*, 505 U.S. at 768.

> Indicia [of a mark's descriptiveness] include: (1) the mark's dictionary definition corresponds with its meaning and context; (2) upon hearing the mark, one need not use "imagination, thought and perception to reach a conclusion as to the nature of goods"; (3) "competitors would be likely to need the terms used in the trademark in describing their products"; and (4) others would have used the term in marketing a similar service or product.

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 232 (5th Cir. 2009) (quoting *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 792 (5th Cir. 1983)).  Jones claims that no competitor has used his mark for over twenty years, that the mark is not in the dictionary and thus has no ordinary significance to the public, that imagination is required to determine what a Medical Exercise Specialist does, and that there is no evidence of widespread use by others in the industry. Dkt. 22.  He also cites evidence in the form of affidavits from individuals who work in the industry that indicates that these individuals perceive the term as being unique to Jones's program, at least until ACE started using the term in 2015.  *Id.* (citing exhibits).

ACE argues that the mark is generic and thus not protectable.  Dkt. 34.  ACE contends that "Medical Exercise Specialist" is a "common descriptive (generic) title for specialists in medical exercise."  *Id.*  ACE points to deposition testimony in which Jones indicates that the terms "medical exercise" and "exercise specialist," when used separately, are generic terms.  *Id.* (citing Dkt. 27, Ex. A-19).  ACE argues that "medical exercise" and "exercise specialist" are common terms of general use and knowledge in the fitness industry and that combining these two generic terms for

specialists in medical exercise is generic. *Id.* (citing Dkt. 27, Exs. A10–A-27, A-31, A-46, A-48, A-49).

First, the court remains unconvinced that the mark is generic simply because it consists of a combination of generic terms. The court finds, for the reasons stated in the order denying ACE's motion for summary judgment, that Jones has met his burden of showing the mark is not generic, at least under the current record. However, whether the mark rises to suggestive, as opposed to descriptive, is another matter. While the court found in its summary judgment order that there is an issue of material fact regarding whether the mark is suggestive and thus inherently distinctive, the court does not believe there is a "substantial likelihood of success" that the finder of fact will find the mark is suggestive. *See* Dkt. 58 (summary judgment order). Accordingly, the court moves on to the determination of whether there is a substantial likelihood of success that the mark has acquired distinctiveness through secondary meaning.

**(b) Has the Mark Acquired Distinctiveness Through Secondary Meaning?**

Jones argues, in the alternative, that the mark has acquired distinctiveness through secondary meaning. Whether a mark has acquired secondary meaning is a question of fact. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 234 (5th Cir. 2010). A mark has developed secondary meaning "'when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'" *Id.* at 237 (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210–11, 120 S. Ct. 1339 (2000)). "Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." *Id.* To make this determination, one must consider the "public's mental

association between the mark and the alleged mark holder." *Smack Apparel Co.*, 550 F.3d 465 at

476. The Fifth Circuit uses the following multi-factor test to determine secondary meaning:

> The factors include: (1) length and manner of use of the mark or trade
> dress, (2) volume of sales, (3) amount and manner of advertising, (4)
> nature of use of the mark or trade dress in newspapers and magazines,
> (5) consumer-survey evidence, (6) direct consumer testimony, and (7)
> the defendant's intent in copying the trade dress.

*Id.* "These factors in combination may show that consumers consider a mark to be an indicator of

source even if each factor alone would not prove secondary meaning." *Id.*

Jones contends that he coined the phrase "Medical Exercise Specialist" in 1994 and has been

using it to describe his course for over twenty years. Dkt. 22. He notes that he has sold more than

7,000 course and certifications, compared to ACE's 2,613 courses and 822 certifications for the

different iterations of its competing course. Dkt. 22 (citing Dkt. 22, Ex. 4 at ACE007071, Ex. 8).

He also points out that he has advertised the program extensively in industry publications, magazines,

and online, and asserts that this supports a finding of secondary meaning. *See id.* (citing Dkt. 22, Exs.

1, 2A, 13–17). He states that he has received thousands of consumer inquiries, including 60,000 calls

and emails from potential customers. Dkt. 22, Exs. 1 ¶ 2, 2A at 35 ¶ 6. Jones argues that ACE's

copying of the mark demonstrates secondary meaning, and he provides declarations or affidavits from

customers who indicate that they were confused when ACE began using the name. Dkt. 22 (citing

Exs. 1, 2A,  7).

ACE argues that the court cannot grant a preliminary injunction without a "high degree of

proof," and asserts that Jones fails to meet this threshold because he offers no survey evidence.

Dkt. 34 (citing *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999)). ACE then notes

that Jones stated that he lost the last four years of his business records, and argues that this fact in and

9

of itself requires a finding that Jones cannot meet the high degree of proof standard. *Id.* (citing Dkt. 34, Ex. A-47 at 35–39). As far as the other factors, ACE argues that (1) Jones did not use the term "medical exercise specialist" as a trademark but merely as a title for a course and certification; and (2) notwithstanding the advertising, the mark does not function as a brand and instead merely describes the course. *Id.*

As to the first factor—length and manner of use—Jones argues that he is entitled to a presumption of secondary meaning because he used the mark for more than five years. In *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 783 (8th Cir. 1995), the Eighth Circuit considered whether the trade dress for two of the plaintiff's products in its personal organizer line had acquired secondary meaning. The court noted that the statute relating to registering trademarks states that "the trademark commissioner may accept proof of five years' exclusive and continuous use of a mark as prima facie evidence of secondary meaning"; the court found that "[t]his suggests that five years' use is a strong factor in favor of secondary meaning." *Stuart Hall*, 51 F.3d at 789. It then noted that "[a]lthough 'no absolute time span can be posited as a yardstick in cases involving secondary meaning,' . . . length and exclusivity of continuous use is a factor bearing on secondary meaning." *Id.* at 789–90 (quoting *Centaur Commc'ns v. A/S/M Commc'ns*, 830 F.2d 1217, 1221 (2d Cir. 1987)). It concluded that "Stuart Hall's exclusive and continuous use of its trade dress for the period of time that creates a statutory presumption of secondary meaning for trademark registration weighs in favor of a finding of secondary meaning." *Id.* at 790. Thus, the court did not institute a burden-shifting presumption when determining secondary meaning in the non-registered trademark analysis, but it did consider the time period a significant factor. Here, the court finds it significant that Jones used the term consistently for more than twenty years. While the court takes note of ACE's arguments and evidence

that Jones did not "use it as a mark" in that he did not use any trademark symbols or tell others that it was a mark, the court finds that this factor weighs in favor of secondary meaning.

The other factors, except for survey evidence, all also weigh at least slightly in Jones's favor. Jones provides evidence that he has sold more than 7,000 "Medical Exercise Specialist" courses and that he has advertised the course in various ways, including electronic newsletters, mass-mail advertisements mailed to gyms, flyers, print advertisements in major industry publications, domain names that link to Jones's website, and word-of-mouth advertising. *See* Dkt. 22, Exs. 1, 2A, 13, 14, 16; *see, e.g.*, Dkt. 2A at 9–15 (declarations of employees of Jones regarding the extent of advertising). These factors weigh strongly in favor a finding secondary meaning. Jones also provides direct consumer testimony that consumers associate the name with Jones. *See* Dkt. 22, Exs. 2A, 2B; *see, e.g.*, Dkt. 22, Ex. 2A at 4, ¶ 7 ("In all my years in the industry, I've always heard and used the name 'Medical Exercise Specialist' as a way to identify Dr. Jones's program."); Ex. 2A at 7, ¶ 7 ("Based on my knowledge of the industry, I believe it is fairly well known that the 'Medical Exercise Specialist' refers to the course and certification offered by Dr. Jones."); Ex. 2A at 27, ¶ 4 ("I've always exclusively associated the name 'Medical Exercise Specialist' with the course and certification offered by Dr. Michael Jones."). While Jones had the ability to pick and choose these consumers, he provides numerous declarations and affidavits indicating that people associate the name with him. Thus, the testimony factor weighs in his favor. And finally, the fact that ACE was aware of Jones's course (since Jones was a continuing education provider for ACE and listed this same course) and then later chose to use the same name in the same industry for a similar course weighs in favor of Jones. *See* Dkt. 22 at 19.

11

That being said, there is no formal survey. According to the Fifth Circuit, "survey evidence is the most direct and persuasive evidence." *Sugar Busters*, 177 F.3d at 269. Here, Jones offers affidavits from various individuals in the industry rather than a formal survey. While the "absence of consumer surveys need not preclude a finding of acquired distinctiveness," under the facts of this case, especially since it involves a specialized industry, the absence of a survey weighs heavily against a finding of secondary meaning. *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1583 (Fed. Cir. 1988) (noting that the United States Patent and Trademark Office Trademark Trial and Appeal Board's finding that a particular design had acquired secondary meaning was not "clearly erroneous" even though no consumer survey evidence had been presented).

When the court weighs all of these factors, they weigh in favor of Jones, notwithstanding the lack of a survey. However, for the court to grant a motion for a preliminary injunction, the factors must weigh in favor of a *substantial* likelihood of success. The weight in favor of Jones is not significant enough for the court to determine that he has a substantial likelihood of success on secondary meaning.

The court could end its inquiry regarding substantial likelihood of success because it has found there is not a substantial likelihood of success on Jones's claim that the mark is inherently distinctive or has acquired secondary meaning, and both distinctiveness and confusion are required to show infringement. However, the court will consider whether there is a likelihood of confusion because it may be relevant to the irreparable harm prong of the preliminary injunction test. *See* Part IV.B, *infra*.

### (c) Is There a Likelihood of Confusion?

Jones argues that confusion is highly likely to occur from ACE's appropriation of the name

12

Medical Exercise Specialist to offer a "superficially similar" course in the same industry with the same potential customers.  Dkt. 22.  ACE contends that there is no likelihood of "actionable confusion."  Dkt. 34.  It notes that likelihood of confusion is not "*possible* confusion," but "*probable* confusion."  *Id.* (citing *Smack Apparel*, 550 F.3d at 478).  It argues that Jones's alleged mark is weak; that ACE generally uses "ACE Certified" with the term "Medical Exercise Specialist," making the marks dissimilar; that the courses are not advertised in the same media or retail outlet; that ACE chose the name in good faith after a study; and that Jones's evidence of actual confusion is not compelling.  *Id.*

Courts in the Fifth Circuit consider the following "digits of confusion" factors to determine if a likelihood of confusion exists:

> (1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers.

*Am. Rice, Inc.*, 518 F.3d at 329.  However, when "a defendant uses a plaintiff's exact marks . . . courts within this Circuit have determined that a thorough analysis of the digits of confusion is unnecessary, and a presumption of confusion exists."  *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 540 (S.D. Tex. 2013) (Costa, J.) (citing *Paulsson Geophysical Servs.*, 529 F.3d at 310–11).

The initial question, then, is whether the marks are exactly the same.  The court discussed how ACE uses the term extensively at pages 34 through 38 of its order on ACE's motion for summary judgment.  *See* Dkt. 58 at 34–38.  ACE often uses the term "ACE Certified" with the term "Medical Exercise Specialist."  But, there are times it uses the term "Medical Exercise Specialist" without the term "ACE Certified."  The court finds that the fact that ACE uses the exact same term in the same

industry gives rise to a presumption that confusion exists.  However, the court will consider the digits of confusion to determine if ACE sufficiently rebuts the presumption.

### (i)  Strength of the Mark

The first factor is the strength of the mark.  Jones contends he has a strong mark as is evidenced by its inherent and acquired distinctiveness. Dkt. 22.  ACE contends that it is a weak mark. Dkt. 34.  The court finds that this factor is neutral for the purposes of the preliminary injunction analysis.

### (ii)  Similarity of Products and Design and Identity of Retail Outlets and Purchasers

The next three factors are similarity of design between the marks, similarity of the products, and identity of retail outlets and purchasers.  Both marks are similar in that they both use the phrase "Medical Exercise Specialist" and ACE does not always use other words in conjunction with this phrase.  The courses are also both offered to professionals who work in the fitness industry.  ACE points out that the certifications are sold on different websites, but the court finds that this factor bears little weight in this case.  If there were a physical store where people bought the certifications, both courses would be offered in the same types of outlets; they ultimately target the same type of individual.  These three factors weigh in Jones's favor.

### (iii)  Similarity of Advertising Media

The next factor is similarity of advertising media used.  Jones contends that the media is the same because ACE and Jones both largely advertise on their websites and through social media.  Dkt. 22 (citing Dkt. 22, Ex. 3 (ACE's press release for the "ACE Medical Exercise Specialist Certification" from ACE's website)).  ACE notes that while both parties, "as well as most everything

14

else in the world," can be found online, "the parties' unique advertising media lowers the likelihood

of confusion." Dkt. 34.  ACE's determination of "unique" appears to be that the courses are offered

on different websites and Jones runs his website out of his apartment.  *Id.*  ACE, however, misses the

point.  They both advertise their products in similar ways online.  Potential customers looking for a

course like this will likely find both certifications by using a search engine, and they will not know

if the website is run out of an office building or apartment.  The court finds that this factor weighs in

favor of Jones.

### (iv)  Defendant's Intent

The next factor is the defendant's intent.  Jones contends that this factor weighs in his favor

because ACE copied his name.  Dkt. 22.  ACE asserts that it did not copy Jones's name and only

chose the name because a study indicated that it was the most descriptive name for ACE's

certification.  Dkt. 34.  ACE also asserts that its use of its own trademark, "ACE," on and around the

term further demonstrates it is using the term in good faith.  *Id.*  Jones points out, in reply, that at

ACE's corporate representative's deposition, the representative testified that twelve people

participated in ACE's role delineation study and "no individual suggested" the title "Medical Exercise

Specialist" or "Certified Medical Exercise Specialist."  Dkt. 35, Ex. 2 at 19–20.

ACE's Chief Science Officer, who was on the study panel, states that "the panel performing

the role delineation study considered an alternative name for the certification – Medical Exercise

Specialist – which accurately conveyed the commonly described job role."  Dkt. 27, Ex. A-31.  He

admits that he knew about Jones's use of the term when ACE chose it, but he felt that Jones's course

name was just a description of "the job role in plain common terminology."  *Id.*  He reports that the

study panel "readily concluded that 'Medical Exercise Specialist' was the obvious and most accurate title for the job role to convey immediately to others what the professional is trained to do." *Id.*

The court finds that this factor does not clearly weigh in favor of either party.

### (v) Actual Confusion

The next factor is actual confusion. Jones provides evidence that some consumers were confused when ACE started using the same term to describe its course and associated certification. *See, e.g.*, Dkt. 22, Ex. 1, ¶ 42 (Jones's declaration, detailing calls he received from confused customers after ACE launched its certification, including customers who wondered if Jones had partnered with ACE); Dkt. 22, Ex. 7 at 2 (comment on ACE's Facebook announcement about the "ACE Medical Exercise Specialist Manual" from an ACE customer who also held Jones's Medical Exercise Specialist certification, stating that the customer was "concerned there will be confusion in the market"). Some of Jones's witnesses stated that they wondered if Jones had sold his business to ACE. *See, e.g.*, Dkt. 22, Ex 2B at 13, ¶ 8 ("I was taken aback and confused . . . . Had Dr. Jones sold out to a company like ACE?").

ACE contends that this evidence "actually indicates a lack of confusion." Dkt. 34 at 19. ACE states that Jones's evidence does not indicate that people called him thinking he was ACE. *Id.* ACE asserts that questioning affiliation is not actionable trademark confusion, citing *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 124 (2d Cir. 2001), *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 365 (S.D.N.Y. 2009), *aff'd* 379 F. App'x 4 (2d Cir. 2010), and *Gross v. Bare Excentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 187 (S.D.N.Y. 2008). Jones counters that his customers actually *believed* Jones was affiliated with ACE, rather than just expressing curiosity,

which demonstrates actual confusion, citing *Virgin Enterprises v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003).

In *Nora Beverages*, the Second Circuit considered a dispute centering around trade dress on 1.5-liter plastic bottles used for spring water. 269 F.3d at 117. The plaintiff argued that the district court erred in failing to weigh evidence of distributor inquiries about whether the companies were affiliated. *Id.* at 123. The Second Circuit found that "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack of confusion* between the products such as to inspire the inquiry itself." *Id.*

In *Biosafe-One, Inc.*, the U.S. District Court for the Southern District of New York considered a motion for summary judgment in a case about alleged theft of a website that included claims for trademark and trade dress infringement, among other claims. 639 F. Supp. 2d at 363. The plaintiffs submitted an email from a customer who inquired whether the two websites were related, arguing that it demonstrated likelihood of confusion. *Id.* at 365. The court held that the plaintiffs were mistaken because "'[i]nquiries about affiliation are not enough to find "actual confusion."'" *Id.* (quoting *Gross*, 641 F. Supp. at 187)). The court also found it significant that the plaintiffs only submitted one such inquiry. *See id.*

In *Gross*, the U.S. District Court in the Southern District of New York considered a motion for summary judgment in a trademark and trade dress case relating to two skincare lines. 641 F. Supp. 2d at 183. The court noted that "evidence of actual confusion is given particular weight" and that "[s]ubstantial evidence of actual confusion, by itself, is enough to support a finding of trademark infringement." *Id.* at 187. It found, however, that there was a conflict with regard to whether

17

evidence of confusion about affiliation was evidence of actual confusion because the *Nora Beverages* court had held that "[i]nquiries about affiliation alone are not enough to find 'actual confusion,'" yet another court, the *Virgin Enterprises* court, had found that "evidence of consumers inquiring about whether the defendant's products were affiliated with plaintiff's products is evidence of actual confusion." *Id.* (citing *Nora Beverages*, 269 F.3d at 124, and *Virgin Enters.*, 335 F.3d at 151). The court noted that it was "of the view that inquiries about affiliation suggest that there is confusion," but it found there was no need for it to decide which precedent to follow because there was other evidence of actual confusion. *Id.*

In *Virgin Enterprises*, the Second Circuit considered an appeal of a denial of a motion for preliminary injunction in a case in which a cellular phone and services provider began using certain marks incorporating the term "Virgin." 335 F.3d at 143–44. The plaintiff, Virgin Enterprise, Ltd., had been using the Virgin mark for many years in connection with retail stores, computers and electronics, and even an airline. *Id.* at 143. The plaintiff sought a preliminary injunction, and the district court found that no evidentiary hearing was required. *Id.* It denied the motion for preliminary injunction because the plaintiff's use of the mark did not include telephones or telephone services. *Id.* at 145. In its analysis, the Second Circuit considered an affidavit of a former employee of the telephone and telephone services provider who worked at a mall kiosk for Virgin Wireless. *Id.* at 151. The affiant stated that customers had asked him if the kiosk was affiliated with the "Virgin" stores. *Id.* The Second Circuit, without discussing *Nora Beverages*, concluded that the "district court correctly concluded that this evidence weighed in plaintiff's favor." *Id.*

While the *Nora Beverages* panel was earlier than the *Virgin Enterprises* panel, the court need not engage in a discussion as to which precedent applies because both cases are merely persuasive

authority to a district court in the Fifth Circuit.  The court believes that this case is more similar to the *Virgin Enterprises* case and that the evidence submitted by Jones indicates that his customers were actually confused.  Moreover, in an effort not to miss the forest for the trees, the court notes that the factor it is trying to analyze with the digits of confusion test is whether ACE's use of Jones's trademark "creates a likelihood of confusion as to source, *affiliation*, or sponsorship," which is the test for trademark infringement in the Fifth Circuit.  *See Elvis Presley Enter.*, 141 F.3d at 193 (emphasis added).  Since the Fifth Circuit names affiliation in the main standard, it is highly unlikely it would be convinced by Second Circuit authority suggesting confusion about affiliation is not evidence of actual confusion.  *Compare id.* (listing the second element as "likelihood of confusion as to source, affiliation, or sponsorship"), *with Virgin Enters.*, 335 F.3d at 146 ("The test [for trademark infringement used in the Second Circuit] looks first to whether the plaintiff's mark is entitled to protection, and second to whether defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."), *and Nora Beverages, Inc.*, 269 F.3d at 118–19 ("[I]n order to prevail on an infringement claim, a plaintiff must also prove the allegedly infringing product is likely to confuse consumers as to its source or sponsorship.").  This factor thus weighs in Jones's favor.  He has shown at least some customers were actually confused about affiliation.

### (vi)  Degree of Care Exercised by Potential Purchasers

The final factor is degree of care exercised by potential purchasers.  Jones argues that potential customers are unlikely to exercise much care distinguishing between the companies.  Dkt. 22 at 21.  The affidavits he submits go both ways.  The customers who have already been certified by Jones seem to exercise care in knowing the difference and perceive the ACE certification as inferior, but

19

some of these customers refer to others in the industry who may not exercise care to make sure they are taking the right course (hence confusion). *See generally* Dkt. 22, Exs. 2A, 2B.  The court finds that this factor is neutral.

After considering all of these factors, the court finds that ACE has not overcome the presumption of confusion.  However, in order for a preliminary injunction to issue, there must be a substantial likelihood of success.  Even if the court were to construe all the questions of fact in Jones's favor, the court finds that Jones cannot meet its burden of showing a substantial likelihood of success as to distinctiveness.

## B.    Irreparable Harm

The next step of the inquiry is a determination of whether there is a substantial threat of irreparable injury if the injunction is not issued.  The "extraordinary equitable remedy" of an injunction requires that the plaintiff demonstrate that, without injunctive relief, he will suffer an irreparable injury for which damages are an inadequate remedy.  *Brennan's, Inc. v. Brennan*, 289 F. App'x 706, 707 (5th Cir. 2008); *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008).  The Fifth Circuit has opined that, in some circumstances, irreparable injury can be presumed in a trademark infringement claim based on a showing of a likelihood of confusion.  *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (noting that "[a]ll that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion, injury is presumed"); *see also Paulsson Geophysical Servs.*, 529 F.3d at 313 (commenting that "[w]hen likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of the goods or services . . . ." but also noting that "[t]his Court has avoided 'expressly adopting this presumption of irreparable

injury'" (quoting *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., LLC*, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999) (Rosenthal, J.)).

Jones asserts that the court should apply a presumption of irreparable harm under *Abraham* and that ACE cannot rebut the presumption, noting that ACE's continued infringement of the mark causes loss of reputation and goodwill, damaged customer relations and lost growth, and a decline in the value of Jones's intellectual property. Dkt. 22.

ACE argues first that Jones waited too long to bring his request for a preliminary injunction and that this delay is sufficient to rebut any presumption of irreparable harm. Dkt. 34 at 4 (citing *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007)). ACE also argues that the court should not apply a presumption and claims that any reduction in revenue suffered by Jones is due to his own reduced efforts in running his business and other competition in the field, not from ACE's use of the term "Medical Exercise Specialist." Dkt. 34.

### 1. Timing

With regard to the timing argument, ACE asserts that Jones did not file his motion for preliminary injunction until eleven months after he learned about ACE's newly named program. *Id.* at 5. Jones notes in reply that there was no undue delay in this case, as Jones filed as soon as practical after learning of ACE's infringement, demanded a preliminary injunction in his petition, engaged in settlement discussions with ACE, and aggressively pursued the injunction by filing a motion after he realized the settlement negotiations were not going to be successful. Dkt. 35 (citing Dkt. 35, Ex. 1 (Jones's supplemental declaration)).

Certainly, an unexcused delay of eleven months would rebut the presumption, if the court were to apply the presumption. *See Solofill. LLC v. Adrien Rivera*, No. 16-2702, slip copy (S.D. Tex.

Feb. 8, 2017) (Miller, J.) (collecting cases relating to delay).  In such a case, the defendant could assert a defense of laches.  "Laches comprises three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay." *Smack Apparel Co.*, 550 F.3d at 490.  If the defendant, however, has unclean hands, it cannot assert this equitable defense.  *Id.*

Here, Jones declares that he found out about the alleged infringement on August 20, 2015, and he "immediately set out to investigate the infringement and find a trademark attorney." Dkt. 35, Ex. 1.  He filed his lawsuit about two months later (on November 5, 2015), which he asserts was "as soon as practical after meeting with attorneys, providing the relevant documents and facts, and having a complaint drafted." *Id.*  The court does not believe that this is an unreasonable delay, particularly since Jones operates a small business and does not have an attorney on retainer.  *See id.*

The complaint contained a demand for an injunction. *See* Dkt. 1 ¶ 36 & Prayer for Relief ¶ 3. Jones, however, did not immediately move for an injunction because his attorney and ACE's attorney engaged in settlement negotiations for the next several months. Dkt. 35, Ex. 1. Jones contends that he eventually "realized that ACE was just stringing me along" so he "retained additional counsel in January," filed his amended complaint, and formally served ACE with the lawsuit. *Id.*  ACE did not file its answer until March 28, 2016. Dkt. 8. Jones asserts that he "wanted a preliminary injunction hearing as soon as possible" but "came to understand that there would be a need to conduct limited discovery, take depositions, submit a brief, and give ACE time to respond." Dkt. 35, Ex. 1. According to Jones, the attorneys eventually agreed to a hearing date in July.[1] *Id.*  While Jones could

---

[1]  The court cancelled the hearing in July so that it could review the motion for summary judgment first.  The voluminous filings, exhibits, and objections in this case have taken more extensive time and judicial resources than originally anticipated by the court, which has led to a

have sought a preliminary injunction prior to conducting limited discovery, the court does not believe that the delay was without explanation or excuse, particularly since the parties worked together to discuss the date of the injunction hearing.  ACE was at least partially responsible for the delay and cannot in fairness now claim it was prejudiced by the delay.

### 2.      Presumption of Irreparable Harm and Cause of Harm

The court is also not persuaded by ACE's argument against applying a presumption or its argument that any reduction in revenue suffered by Jones is due to reduced efforts in running his business and other competition in the field and thus not irreparable harm caused by ACE's use of the term at issue.  Even if the court did not apply a presumption, the declarations and affidavits Jones provides relating to concerns about the impact of ACE offering a certification using the exact same name, including reputation damage, are sufficient evidence of irreparable harm without any evidence of current reduced revenue.  This factor weighs in favor of Jones.

### C.      Injury Versus Harm

The next factor is whether the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted.  Jones argues that the balance of hardships strongly favors granting an injunction because Jones's livelihood revolves around his "Medical Exercise Specialist" business, and ACE is an "industry giant" with millions of dollars of revenue every year.  Dkt. 22. ACE argues that an injunction would inflict hundreds of thousands of dollars of harm to ACE and that this harm is not outweighed by "any speculative threatened injury to the operation Jones runs out of his apartment."  Dkt. 34.  The court finds that this factor is neutral.  Not granting the injunction is causing harm to Jones (as outlined above), and, if Jones is not successful on the merits, granting an

---

significant delay in ruling on the motion for preliminary injunction.

injunction would unnecessarily injure ACE.  The court finds that expediting trial will help minimize the harm to Jones should Jones ultimately prevail.

**D.      Public Interest**

Jones points out that the public has a strong interest in protecting trademarks, enforcing federal statutes, and protecting the rights of small business owners like him who depend on name recognition.  Dkt. 22.  He asserts that, conversely, there is no public interest in allowing a big company like ACE copy the name.  *Id.*  ACE argues that an injunction disserves the public interest as the public would be misled into thinking only Jones's program trains specialists in medical exercise.  Dkt. 34.  It also argues that "trademark laws do not allow Jones to create a monopoly on a type of exercise specialist."  *Id.*

The court finds ACE's points entirely disingenuous since its own materials say the change to "Medical Exercise Specialist" was a name-change only.  ACE was offering the same type of exercise speciality training without using the term "Medical Exercise Specialist."  Thus, an injunction would not be allowing Jones to have a monopoly on this type of training.  This factor clearly weighs in Jones's favor.

**E.      Weighing the Factors**

While all of the factors except substantial likelihood of success are either neutral or weigh in Jones's favor, Jones must clearly carry the burden of persuasion on all four factors for the court to invoke the extraordinary remedy of granting a preliminary injunction.  Jones's motion for preliminary injunction is therefore DENIED.

However, the court finds that this is a very close case and is of the opinion that it is in the parties' best interest for this case to be tried as expeditiously as possible.

24

## V. CONCLUSION

Jones's motion for a preliminary injunction is DENIED.  However, the court is going to expedite the trial in this case.  The court ORDERS the parties to meet and confer regarding a potential trial date during the summer of 2017.  The parties shall agree to three different trial dates and provide those to the court's case manager within fourteen (14) days of the date of this order.

Signed at Houston, Texas on March 29, 2017.

Gray H. Miller
United States District Judge